EILEEN M. DECKER
United States Attorney
THOMAS D. COKER
Assistant United States Attorney
Chief, Tax Division
ANDREW T. PRIBE (CA SBN 254904)
Assistant United States Attorney
    Federal Building, Suite 7211
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone: (213) 894-6551
    Facsimile: (213) 894-0115
    E-mail: andrew.t.pribe@usdoj.gov

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AUGUST BOHANEC and MARIA BOHANEC, <br><br> Defendants. | Case No.: 2:15-CV-4347 DDP (FFMx) <br><br> United States of America's proposed findings of fact and conclusions of law <br><br> Trial date: November 1, 2016 <br><br> Judge Dean D. Pregerson |

The United States submits the following proposed findings of fact and conclusions of law.

**I.    Findings of fact.**

1.   August Bohanec was born in 1933 in Slovenia.

2.   August Bohanec immigrated to the United States in 1961 and became a naturalized citizen of the United States in the mid-to-late 1960s.

3.   Before immigrating to the United States, August Bohanec was trained as a tool-and-die maker.

4.   Maria Bohanec was born in 1943 in Mexico.

5.   Maria Bohanec immigrated to the United States in the 1960s and became a naturalized citizen of the United States in the 1990s.

6.   The highest level of education Maria Bohanec has is the 6th grade in Mexico.

7.   August Bohanec and Maria Bohanec have been continuously married since at least 1970.

8.   In the 1970s, the Bohanecs purchased a camera shop in Pasadena, California, called Alvin's.

9.   The Bohanecs initially sold many different brands of cameras at Alvin's, but after a few years they sold only Leica cameras.

10.   The Bohanecs initially obtained their Leica merchandise from Leica's distributor in New Jersey which was the exclusive distributor of Leica products in the United States.

11.   Leica is a German brand of camera, but it had a subsidiary in Canada called Leitz Canada.

12.   Through their camera shop, Bohanecs became acquainted with the president of Leitz Canada, Walter Kluck.

1    13.    Sometime in the late 1970s or the early-to-mid 1980s, Kluck
2 offered to sell Leitz Canada cameras to the Bohanecs directly from Leitz
3 Canada.
4    14.    In addition, during the 1980s, the Bohanecs brokered
5 transactions between Leitz Canada and various camera retailers around the
6 world.  Kluck contacted the Bohanecs requesting their assistance in finding
7 international buyers for their products for which the Bohanecs would earn a
8 commission.
9    15.    These commissions for international sales were deposited into an
10 account at UBS AG in Switzerland in the Bohanecs' name.
11    16.    UBS AG is a Swiss financial-services company.
12    17.    In addition to these deposits, on at least a few occasions, the
13 Bohanecs also directed their international customers to deposit money
14 directly into their UBS account.
15    18.    The Bohanecs did not report the income they received from Leitz
16 Canada for the commissions on their federal income-tax returns.
17    19.    The UBS account was managed by Walter Kluck while he was
18 alive and, thereafter, by UBS.
19    20.    At some point, Kluck told the Bohanecs that the Bohanecs' UBS
20 account had a balance in excess of $700,000.
21    21.    The Bohanecs closed Alvin's Camera sometime in the late 1980s.
22    22.    The Bohanecs would occasionally withdraw money from their
23 UBS account.
24    23.    In June 2003, the Bohanecs transferred $10,000 from their UBS
25 account in Switzerland to their daughter, Yolanda Reischer-Bohanec.
26 Exhibit 11 is a copy of the UBS notice regarding this transfer.
27    24.    In July, 2003, the Bohanecs transferred $25,000 from their UBS
28 account in Switzerland to August Bohanec's account at Steiermärkische

1 Bank in Austria.  Exhibit 12 is a copy of the UBS notice regarding this
2 transfer.
3      25.   In December 2003, the Bohanecs transferred $20,000 from their
4 UBS account in Switzerland to their bank account in Austria.  Exhibit 13 is
5 a copy of the UBS notice regarding this transfer.
6      26.   In February 2006, the Bohanecs transferred $25,000 from their
7 UBS account in Switzerland to Mexico for expenses related to their house in
8 Mexico.  Exhibit 14 is a copy of the UBS notice regarding this transfer.
9      27.   In November 2006, the Bohanecs transferred $7,500 from their
10 UBS account in Switzerland to their Bank of America account in Pasadena,
11 California.  Exhibit 15 is a copy of the UBS notice regarding this transfer.
12      28.   In addition, from October 2004 through October 2008, the
13 Bohanecs made several other withdrawals from their UBS account in
14 Switzerland.  Exhibits 17 through 22 are copies of statements from UBS
15 with notations reflecting these withdrawals.
16      29.   The UBS account had the following balances on the following
17 dates as reflected in Exhibit 10:

| Date | Balance |
|---|---|
| January 31, 1997 | $1,049,900 |
| December 31, 1997 | $1,015,900 |
| December 31, 1998 | $962,600 |
| December 30, 1999 | $1,096,500 |
| December 29, 2000 | $931,200 |
| December 31, 2001 | $732,200 |
| December 31, 2002 | $647,600 |
| December 31, 2003 | $693,600 |
| December 31, 2004 | $645,800 |

3

| December 31, 2005 | $668,300 |
| December 29, 2006 | $654,200 |
| December 31, 2007 | $687,600 |

30. The deadline for filing the FBAR for 2007 was June 30, 2008.

31. In 2007, in addition to the UBS account in Switzerland, August Bohanec had a bank account in Austria into which were deposited periodic disability payments he received for an eye injury he sustained before immigrating to the United States.

32. In 2007, in addition to the bank accounts in Austria and Switzerland, the Bohanecs also maintained a bank account in Mexico into which they would deposit money from their UBS account in Switzerland to build and maintain a house in Mexico.

33. The Bohanecs did not file an FBAR for 2007.

34. As of June 30, 2008, the Bohanecs' UBS account had a balance of $643,662 as reflected on Exhibit 8.

35. Before June 30, 2008, the most recent tax return the Bohanecs filed was for tax year 1998.

36. In their 1998 tax return, the Bohanecs reported an adjusted gross income of $62,237 and a federal income tax of $7,480, which was timely paid. A copy of the IRS transcript for this account is exhibit 38.

37. In May and June of 2009, the Bohanecs transferred a total of $522,796.55 from their UBS account to a new account at Steiermärkische Bank. Exhibit 16 is a letter from Steiermärkische Bank und Sparkassen AG enclosing records for these transfers.

38. On January 29, 2010, the Bohanecs closed the Austrian account at Steiermärkische Bank and transferred the balance of $523,677.40 to their account at Bank of America in Pasadena, California. Exhibit 16 is a letter

4

from Steiermärkische Bank und Sparkassen AG enclosing records for these transfers.

39. Beginning in the early 2000s and continuing through at least 2009, the Bohanecs sold Leitz cameras and parts on Ebay.

40. Between the filing of their 1998 federal income-tax return and May 19, 2011, the Bohanecs did not file any federal income-tax returns.

41. Between the opening of the UBS account and May 19, 2011, the Bohanecs did not file any FBARs.

42. On January 6, 2010, the Bohanecs executed an application to participate in the IRS's Voluntary Disclosure Program for Offshore Accounts. Exhibit 23 is a copy of this application.

43. On January 19, 2010, the Bohanecs were preliminarily accepted into the Voluntary Disclosure Program for Offshore Accounts. Exhibit 24 is a copy of this application.

44. On May 19, 2011, the Bohanecs executed and filed FBARs for 2003, 2004, 2005, 2006, 2007, and 2008. Exhibits 25 through 30 are copies of these FBARs.

45. On May 19, 2011, the Bohanecs executed and filed federal income-tax returns for 2003, 2004, 2005, 2006, 2007, and 2008. Exhibits 31 through 36 are copies of these tax returns.

46. While the FBARs filed by the Bohanecs in May 2011 for 2003, 2004, 2005, 2006, 2007, and 2008 included the UBS account, they did not include the Austrian account which was in existence during 2003 through 2008.

47. The FBARs for 2006, 2007, and 2008 filed by the Bohanecs in May 2011 did not include the Mexican account which was in existence during 2006 through 2008.

48. The Bohanecs were ultimately rejected by the IRS for the Voluntary Disclosure Program for Offshore Accounts.

49. While the federal income-tax returns for 2003, 2004, 2005, 2006, 2007, and 2008 included the interest earned on the UBS accounts, they did not include the income earned by the Bohanecs from their EBay sales.

50. On October 3, 2013, the IRS issued a notice of deficiency for tax year 2003 through 2010. Exhibit 37 is a copy of this notice of deficiency.

51. As reflected in the October 3, 2013, notice of deficiency, after audit, the IRS determined the additional tax and penalties:

| Year | Additional tax | Failure-to-file penalty (IRC § 6651(a)(1) | Fraud penalty (IRC § 6663) |
|---|---|---|---|
| 2003 | $16,651 | $4,162.75 | $7,341 |
| 2005 | $53,330 | $13,332.50 | $39,997.50 |
| 2006 | $23,221 | $5,806 | $17,415.75 |
| 2007 | $50,148 | $12,537.75 | $37,611 |
| 2008 | $8,253 | $2,063.25 | $6,189.75 |
| 2009 | $20,690 | — | $14,052 |
| 2010 | $698 | $174.50 | |

52. The Bohanecs did not filed a suit in Tax Court challenging the tax deficiencies reflected in the October 3, 2013, notice of deficiency.

53. The IRS subsequently assessed the additional tax liabilities and penalties specified the October 3, 2013, notice of deficiency.

54. As of September 19, 2016, the outstanding balance on the Bohanecs' federal income-tax liabilities for 2003, 2005, 2006, 2007, 2008, 2009, and 2010 is as follows:

6

| Tax year | Outstanding balance as of September 19, 2016 |
|---|---|
| 2003 | $25,788.63 |
| 2005 | $181,082.53 |
| 2006 | $71,752.07 |
| 2007 | $147,596.88 |
| 2008 | $23,252.12 |
| 2009 | $41,627.03 |
| 2010 | $1,064.35 |
| Total | $492,163.61 |

55.  As of January 1, 2007, one euro was worth $1.32.

**II.  Conclusions of law.**

1.  For a violation under § 5321(a)(5), the United States must establish that the Bohanecs:

   a.  Were United States persons (defined as a U.S. citizen, resident alien, or entity created under U.S. law), 31 C.F.R. § 1010.350(b);

   b.  Who did not timely file an FBAR, 31 U.S.C. § 5321(a)(5)(A); 31 U.S.C. § 5314; 31 C.F.R. § 1010.306(c);

   c.  With respect to a financial interest in, or signature or other authority over, a bank, securities, or other financial account that is in a foreign country, 31 C.F.R. § 1010.350(a);

   d.  With a balance in excess of $10,000, 31 C.F.R. 1010.306(c).

2.  Upon the establishment of these elements, the Bohanecs are each liable for a penalty that shall not exceed $10,000.  31 U.S.C. § 5321(a)(5)(B).

3.  If, the Government also establishes that the Bohanecs willfully failed to file the FBAR, then the maximum penalty is increased from $10,000

7

to the greater of $100,000 or 50% of the balance in the account at the time of violation.  31 U.S.C. § 5321(a)(5)(C) and (D)(ii).

4.     The time of violation is the required date of filing the FBAR, which is June 30 of the year following the year for which the report must be filed.  31 C.F.R. § 1010.306(c).

5.     Here, the FBAR for 2007 is due on June 30, 2008.

6.     As discussed by the Supreme Court in the 1974 case *California Bankers Association v. Shultz,* the Bank Secrecy Act "was enacted by Congress in 1970 following extensive hearings concerning the unavailability of foreign and domestic bank records of customers thought to be engaged in activities entailing criminal or civil liability."  416 U.S. 21, 25–26, 94 S. Ct. 1494, 39 L. Ed. 2d 812 (1974).

7.     The Court said that the Act and its implementing regulations "generally require United States citizens … to file reports of their relationships with foreign financial institutions."  *Id.* at 35.

8.     The express purpose of the Act is to require the maintenance of records and require the making of certain reports which "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings."  *Id.* at 26 (*quoting* 12 U.S.C. § 1839b(a)(2)) (internal quotations omitted).

9.     Congress was concerned about "a serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal, tax, and regulatory enactments."  416 U.S. at 27.

10.    According to the House Report on the bill, Congress received "considerable testimony" regarding the "serious and widespread use of foreign financial facilities located in secrecy jurisdictions" for violating American law including their use "by Americans to evade income taxes,

8

1  conceal assets illegally and purchase gold[.]"  H.R. No. 91–975 (1970), 1970
2  U.S.C.C.A.N. 4394, 4397, 1970 WL 5667.

3    11. According to the report, "[o]ne of the most damaging effects of an
4  American's use of secret foreign financial facilities is its undermining the
5  fairness of our tax laws."  *Id.*

6    12. Specifically referring to "secret foreign financial facilities,
7  particularly in Switzerland," the Report notes that "such an account offers a
8  convenient means of evading U.S. taxes."  *Id.* at 4397–4398.

9    13. In both *United States v. McBride,* 908 F. Supp. 2d 1186, 1201 (D.
10 Utah 2012), and *United States v. Williams,* 2010 WL 3473311, *1, 5 (E.D. Va.
11 2010), *reversed on other grounds,* 489 Fed. Appx. 655 (4th Cir. 2012)—two
12 civil FBAR cases such as this one—the district court applied the
13 preponderance-of-the-evidence standard.

14   14. This conclusion is supported by Supreme Court authority.

15   15. In *Herman & MacLean v. Huddleston,* the Court said that when
16 Congress has not proscribed the standard of proof and the Constitution does
17 not require otherwise, "we have required proof by clear and convincing
18 evidence when particularly important individual interests or rights are at
19 stake."  459 U.S. 375, 389, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983).

20   16. The Court then cited three cases as examples, one involving a
21 proceeding to terminate parental rights, one involving involuntary
22 commitment, and one involving deportation.  *Santosky v. Kramer,* 455 U.S.
23 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), *Addington v. Texas,* 441 U.S.
24 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979), and *Woodby v. INS,* 385
25 U.S. 276, 285–286, 87 S. Ct. 483, 17 L. Ed. 2d 362 (1966).

26   17. The Court said, however, that the "imposition of even *severe civil*
27 *sanctions* that do not implicate such interests has been permitted after proof
28 by a preponderance of the evidence."  459 U.S. at 389–90 (emphasis added).

1  18. The Court noted that "the difficulty of proving the defendant's
2  state of mind supports a lower standard of proof." 459 U.S. at 390 n. 30.
3  19. This conclusion is bolstered by reference to the Supreme Court's
4  decision in *Grogan v. Garner,* in which the Court said that Congressional
5  silence regarding the burden of proof "is inconsistent with the view that
6  Congress intended to require a special, heightened standard of proof." 498
7  U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).
8  20. As reflected in the 1914 case of *United States v. Regan,* the
9  Supreme Court has long held that in collecting a pecuniary penalty, the
10 Government's action "is to be conducted and determined according to the
11 same rules and with the same incidents as are other civil actions." 232 U.S.
12 37, 46–47, 34 S. Ct. 213, 58 L. Ed. 494 (1914),
13 21. Accordingly, the Court concluded that "it was intended that a
14 reasonable preponderance of the proof should be sufficient[.]" *Id.* at 48.
15 22. Thus, the application of the preponderance-of-the-evidence
16 standard is supported both by prior civil-FBAR cases and by Supreme Court
17 authority.
18 23. Willfulness is not defined in 31 U.S.C. § 5321.
19 24. But the Supreme Court has clarified in *Safeco Insurance Co. v.*
20 *Burr* that when "willfulness" is a statutory condition for imposition of civil
21 liability, the Court has "generally taken it to cover not only knowing
22 violations of a standard, but reckless ones as well." 551 U.S. 47, 57, 127 S.
23 Ct. 2201, 167 L. Ed. 2d 1045 (2007).
24 25. Willfulness extends to one's careless disregard of ones of
25 obligation to act. *See Safeco Ins. Co.,* 551 U.S. at 57; *United States v. Illinois*
26 *Central R. Co.,* 303 U.S. 239, 242–43, 58 S. Ct. 533, 82 L. Ed. 773 (1938)
27 ("willfully," as used in a civil penalty provision, includes "conduct marked by
28 a careless disregard whether or not one has the right so to act").

26. As explained by the district court in *United States v. McBride,* "'willfulness' may be satisfied by establishing the individual's reckless disregard of a statutory duty, as opposed to acts that are known to violate the statutory duty at issue." 908 F. Supp. 2d at 1204 (*citing Safeco Ins. Co.,* 551 U.S. at 57).

27. An improper motive is not necessary to establish willful in a civil context. *McBride,* 908 F. Supp. 2d at 1204.

28. In *Williams,* while the district court found that the Williams did not willfully violate the reporting requirements, this determination was reversed by the Fourth Circuit which, citing *Safeco Insurance,* found that "Williams's undisputed actions establish reckless conduct, which satisfies the proof requirements under § 5314." 489 Fed. Appx. 655, 660 (4th Cir. 2012).

29. Cases cited by Defendants in support of their contention that willfulness encompasses only intentional violations of known legal duties are criminal cases and, therefore, are not applicable in defining the scope of willfulness in a civil context.

30. In *Ratzlaf v. United States,* the Supreme Court addressed willfulness for the crime of structuring in violation of 31 U.S.C. §§ 5313 and 5322. 510 U.S. 135, 114 S. Ct. 644, 126 L. Ed. 2d 615 (1994).

31. Similarly, *United States v. Sturman,* 951 F.2d 1466, 1476–77 (6th Cir. 1991), *United States v. Eisenstein,* 731 F.2d 1450 (11th Cir. 1984), *United States v. Granda*, 565 F.2d 922 (5th Cir. 1978), and *United States v. Bank of New England,* 821 F.2d 844 (1st Cir. 1987), are all criminal cases.

32. As noted by the Supreme Court in *United States v. Cheek,* willfulness in criminal tax cases requires the Government to prove that the defendant knew of the duty and "that he voluntarily and intentionally violated that duty." 498 U.S. 192, 111 S. Ct. 604, 112 L. Ed. 2d 617 (1991).

11

1  33. As the Ninth Circuit noted in *United States v. Mousavi,* "in the context of criminal statutes, the word 'willful' generally indicates a requirement of specific intent." 604 F.3d 1084, 1092 (9th Cir. 2010).

34. Here, the Government seeks to enforce a civil penalty, not a criminal one.

35. While the Supreme Court has adopted an especially narrow view of willfulness in criminal taxes, the Supreme Court—as reflected in *Safeco Insurance Co.*—has acknowledged that in civil cases, willfulness includes recklessness. *See Safeco Ins. Co.,* 551 U.S. at 57.

36. As noted by *McBride,* "[a]n individual's actions may be deemed willful if the individual recklessly ignores the risk that conduct is illegal by failing to investigate whether the conduct is legal." 908 F. Supp. 2d at 1209.

37. According to the court, "[t]he same logic applies to those who deliberately avoid learning of their legal duty or the facts that would give rise to their wrongdoing." *Id.* at 1210.

38. Therefore, to support the civil penalty in this case, the Government need not prove that the Bohanecs knew of the FBAR requirement and despite this knowledge, intentionally and voluntarily did not file the FBAR.

39. Rather, the Government need only prove that the Bohanecs were recklessly indifferent to their obligations under federal law.

40. Here, the evidence shows by a preponderance of the evidence that the Bohanecs willfully failed to file their FBAR for 2007.

41. The Government is entitled to judgment against August Bohanec in the amount of $160,915.75 plus all statutory accruals including interest and penalties plus costs and expenses.

42. The Government is entitled to judgment against August Bohanec in the amount of $160,915.75 plus all statutory accruals including interest and penalties plus costs and expenses.

Dated: October 25, 2016

EILEEN M. DECKER
United States Attorney
THOMAS D. COKER
Assistant United States Attorney
Chief, Tax Division

**/s/ Andrew T. Pribe**
ANDREW T. PRIBE
Assistant United States Attorney

13