O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.  2:15-CV-4347 DDP (FFMx) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **FINDINGS OF FACT AND** |
| v. | ) | **CONCLUSIONS OF LAW** |
| | ) | |
| AUGUST BOHANEC AND MARIA | ) | |
| BOHANEC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, United States of America, seeks to collect a civil penalty assessed to Defendants August Bohanec and Maria Bohanec (collectively, "Defendants" or "the Bohances") for willful failure to report their interest in foreign bank accounts during tax year 2007, as required under 31 U.S.C. § 5314 and its implementing regulations. This matter was tried before the court on November 1, 2016.  Having considered the submissions and arguments of the parties, as well as the evidence in the record, the court hereby makes the following findings of facts and conclusions of law.

**I.      FINDINGS OF FACT[1]**

1.      August Bohanec was born in 1933 in Slovenia.

2.      August Bohanec immigrated to the United States in 1961 and became a naturalized citizen of the United States in the mid-to-late 1960s.

3.      Before immigrating to the United States, August Bohanec was trained as a tool-and-die maker.

4.      Maria Bohanec was born in 1943 in Mexico.

5.      Maria Bohanec immigrated to the United States in the 1960s and became a naturalized citizen of the United States in the 1990s.

6.      The highest level of education Maria Bohanec has is the 6th grade in Mexico.

7.      August Bohanec and Maria Bohanec have been continuously married since at least 1970.

8.      August Bohanec owns two camera-related patents.  (Reporter's Transcript ("RT") 32:2-3.)

9.      August Bohanec obtained the two patents without any assistance from a lawyer or anyone else.  (RT 32:6-19.)

10.      In the 1970s, the Bohanecs purchased a camera shop in Pasadena, California, called Alvin's ("the camera shop").

11.      The Bohanecs knew that they had to file tax returns for the camera shop business and that if they earned money, they had to pay taxes.  (RT 7:11-13, 22-23.)

12.      The Bohanecs always had a tax preparer prepare the camera shop's tax returns.  (RT 7:17-19, 24-25; 8:1-2.)

13.      The Bohanecs initially sold many different brands of cameras at the camera shop.

14.      The camera shop lost sales to larger discount stores that sold Japanese cameras.  (RT 25:7-11.)

---

[1] The parties stipulated to many of the facts described herein, which require no additional proof.

15.    The Bohanecs came to an agreement with Leica, a German camera manufacturer, to become an exclusive Leica dealer.

16.    The camera shop was the only exclusive Leica dealer in the world.  (RT 25:15-17.)

17.    The Bohanecs initially obtained their Leica merchandise from Leica's distributor in New Jersey, which was the exclusive distributor of Leica products in the United States.

18.    After other retailers complained about the deals the camera shop received from Leica's New Jersey distributor, the distributor began restricting supply to the Bohanecs' camera shop.  (RT 25:24-25; 26:1-6.)

19.    Leica had a subsidiary in Canada called Leitz Canada.

20.    Through the camera shop, the Bohanecs became acquainted with the president of Leitz Canada, Walter Kluck ("Kluck").

21.    Sometime in the late 1970s or the early-to-mid 1980s, Kluck offered to sell Leica cameras to the Bohanecs directly from Leitz Canada.

22.    By purchasing Leica cameras from Leitz Canada, the camera shop was able to avoid the supply constraints imposed by Leica's exclusive United States distributor.  (RT 26:12-20.)

23.    The camera shop gained a worldwide reputation for repairing and refurbishing certain Leica camera parts.  (RT 27:3-6.)

24.    The camera shop shipped to customers around the world, including in the United States, the Philippines, England, South Korea, and Hong Kong.  (RT 8:9-21.)

25.    During the 1980s, the Bohanecs brokered transactions between Leitz Canada and various camera retailers around the world.  Kluck contacted the Bohanecs requesting their assistance in finding international buyers, for which the Bohanecs would earn a commission.

26.    Commissions for international sales were deposited into an account at UBS AG in Switzerland in the Bohanecs' name.

27.    UBS AG is a Swiss financial-services company.

28. Kluck opened the Swiss account on the Bohanecs' behalf.  (RT 11:3-4, 29:1-3.)

29. The Bohanecs did not provide UBS AG with their home address.  (RT 29:10-14.)

30. The Bohanecs did not tell anyone in the United States, other than their two children, of the existence of the Swiss account.  (RT 33:9-21.)

31. By the time the Bohanecs had the Swiss account, they no longer used a bookkeeper or kept any books.  (RT 13:1-8.)

32. The Bohanecs never discussed the Swiss account with an accountant, lawyer, or banker.  (RT 13:14-21, 29:20-25, 30:1-8.)

33. In addition to the Leitz Canada commission deposits, the Bohanecs directed their international customers, on at least a few occasions, to deposit money directly into the Swiss UBS account.

34. The Bohanecs did not report the commission income they received from Leitz Canada on their federal income-tax returns.

35. The UBS account was managed by Walter Kluck while he was alive and, thereafter, by UBS.

36. At some point, Kluck told the Bohanecs that the Bohanecs' UBS account had a balance in excess of $700,000.

37. The Bohanecs closed Alvin's Camera sometime in the late 1980s.

38. Beginning in the early 2000s and continuing through at least 2009, the Bohanecs sold Leitz cameras and parts on Ebay.

39. The Bohanecs would occasionally withdraw money from their UBS account.

40. In June 2003, the Bohanecs transferred $10,000 from their UBS account in Switzerland to their daughter, Yolanda Reischer-Bohanec.  Exhibit 11 is a copy of the UBS notice regarding this transfer.

41. In July, 2003, the Bohanecs transferred $25,000 from their UBS account in Switzerland to August Bohanec's account at Steiermärkische Bank in Austria.  Exhibit 12 is a copy of the UBS notice regarding this transfer.

42. In December 2003, the Bohanecs transferred $20,000 from their UBS account in Switzerland to their bank account in Austria.  Exhibit 13 is a copy of the UBS notice regarding this transfer.

43. In February 2006, the Bohanecs opened a bank account in Mexico and transferred $25,000 from their UBS account in Switzerland to Mexico for expenses related to a house they were building in Mexico.  Exhibit 14 is a copy of the UBS notice regarding this transfer.  (RT 18:18-23.)

44. In November 2006, the Bohanecs transferred $7,500 from their UBS account in Switzerland to their Bank of America account in Pasadena, California.  Exhibit 15 is a copy of the UBS notice regarding this transfer.

45. In addition, from October 2004 through October 2008, the Bohanecs made several other withdrawals from their UBS account in Switzerland.  Exhibits 17 through 22 are copies of statements from UBS with notations reflecting these withdrawals.

46. The UBS account had the following balances on the following dates as reflected in Exhibit 10:

| Date | Balance |
| --- | --- |
| January 31, 1997 | $1,049,900 |
| December 31, 1997 | $1,015,900 |
| December 31, 1998 | $962,600 |
| December 30, 1999 | $1,096,500 |
| December 29, 2000 | $931,200 |
| December 31, 2001 | $732,200 |
| December 31, 2002 | $647,600 |
| December 31, 2003 | $693,600 |
| December 31, 2004 | $645,800 |
| December 31, 2005 | $668,300 |
| December 29, 2006 | $654,200 |
| December 31, 2007 | $687,600 |

47. United States citizens who have a financial interest in, or signature authority over, a foreign bank account are required to file a Report of Foreign Bank and Financial Accounts ("FBAR").

48. The deadline for filing the FBAR for 2007 was June 30, 2008.

49. In 2007, in addition to the UBS account in Switzerland, August Bohanec had the bank account in Austria, into which were deposited periodic disability payments he received for an eye injury he sustained before immigrating to the United States.

50. In 2007, in addition to the bank accounts in Austria and Switzerland, the Bohanecs also maintained the bank account in Mexico, into which they would deposit money from their UBS account in Switzerland to build and maintain the house in Mexico.

51. The Bohanecs did not file an FBAR for 2007.

52. As of June 30, 2008, the Bohanecs' UBS account had a balance of $643,662 as reflected on Exhibit 8.

53. Before June 30, 2008, the most recent tax return the Bohanecs filed was for tax year 1998.

54. In their 1998 tax return, the Bohanecs reported an adjusted gross income of $62,237 and a federal income tax of $7,480, which was timely paid. A copy of the IRS transcript for this account is exhibit 38.

55. Part III to Schedule B of the 1998 tax form 1040 concerns foreign accounts and trusts. (Ex. 39.)

56. Question 7a in Part III to the Schedule B asks the following question: "At any time during 1998, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TD F 90-22.1." (Ex. 39.)

57. Page B-2 of the instructions for Schedule B for 1998 states: "See [FBAR] Form TD F 90-22.1 to find out if you are considered to have an interest in or

1    signature or other authority over a financial account in a foreign country (such

2    as a bank account, securities account, or other financial account)."  (Ex. 40.)

3  58.    Page B-2 of the instructions for Schedule B for 1998 also states: "If you

4    checked the Yes box on line 7a, file [FBAR] Form TD F 90-22.1 by June 30,

5    1999, with the Department of the Treasury at the address shown on that

6    form."  (Ex. 40.)

7  59.    In May and June of 2009, the Bohanecs transferred a total of $522,796.55 from their

8    UBS account to a new account at Steiermärkische Bank.  Exhibit 16 is a letter from

9    Steiermärkische Bank und Sparkassen AG enclosing records for these transfers.

10  56.    On January 29, 2010, the Bohanecs closed the Austrian account at Steiermärkische

11    Bank and transferred the balance of $523,677.40 to their account at Bank of

12    America in Pasadena, California.  Exhibit 16 is a letter from Steiermärkische Bank

13    und Sparkassen AG enclosing records for these transfers.

14  57.    Between the filing of their 1998 federal income-tax return and May 19, 2011, the

15    Bohanecs did not file any federal income-tax returns.

16  58.    Between the opening of the UBS account and May 19, 2011, the Bohanecs did not

17    file any FBARs.

18  59.    On January 6, 2010, the Bohanecs executed an application to participate in the

19    IRS's Voluntary Disclosure Program for Offshore Accounts.  Exhibit 23 is a copy of

20    this application.

21  60.    The Bohanecs' application, submitted under penalty of perjury, represented that

22    the "original balance and all funds deposited into the [Swiss UBS] account were

23    after-tax earnings from our used camera business."  (Ex. 23.)

24  61.    On January 19, 2010, the Bohanecs were preliminarily accepted into the Voluntary

25    Disclosure Program for Offshore Accounts.  Exhibit 24 is a copy of this

26    application.

27  62.    On May 19, 2011, the Bohanecs executed and filed FBARs for 2003, 2004, 2005,

28    2006, 2007, and 2008.  Exhibits 25 through 30 are copies of these FBARs.

63.  On May 19, 2011, the Bohanecs executed and filed federal income-tax returns for 2003, 2004, 2005, 2006, 2007, and 2008.  Exhibits 31 through 36 are copies of these tax returns.

64.  While the FBARs filed by the Bohanecs in May 2011 for 2003, 2004, 2005, 2006, 2007, and 2008 included the UBS account, they did not include the Austrian account, which was in existence during 2003 through 2008.

65.  The FBARs for 2006, 2007, and 2008 filed by the Bohanecs in May 2011 did not include the Mexican account, which was in existence during 2006 through 2008.

66.  The Bohanecs were ultimately rejected by the IRS for the Voluntary Disclosure Program for Offshore Accounts.

67.  While the federal income-tax returns for 2003, 2004, 2005, 2006, 2007, and 2008 included the interest earned on the UBS accounts, they did not include the income earned by the Bohanecs from their EBay sales.

68.  On October 3, 2013, the IRS issued a notice of deficiency for tax year 2003 through 2010.  Exhibit 37 is a copy of this notice of deficiency.

69.  As reflected in the October 3, 2013, notice of deficiency, after audit, the IRS determined the additional tax and penalties:

| Year | Additional tax | Failure-to-file penalty (IRC § 6651(a)(1)) | Fraud penalty (IRC § 6663) |
| --- | --- | --- | --- |
| 2003 | $16,651 | $4,162.75 | $7,341 |
| 2005 | $53,330 | $13,332.50 | $39,997.50 |
| 2006 | $23,221 | $5,806 | $17,415.75 |
| 2007 | $50,148 | $12,537.75 | $37,611 |
| 2008 | $8,253 | $2,063.25 | $6,189.75 |
| 2009 | $20,690 | — | $14,052 |
| 2010 | $698 | $174.50 | |

70.   The Bohanecs did not file a suit in Tax Court challenging the tax deficiencies reflected in the October 3, 2013, notice of deficiency.

71.   The IRS subsequently assessed the additional tax liabilities and penalties specified the October 3, 2013, notice of deficiency.

72.   As of September 19, 2016, the outstanding balance on the Bohanecs' federal income-tax liabilities for 2003, 2005, 2006, 2007, 2008, 2009, and 2010 is as follows:

| Tax year | Outstanding balance as of September 19, 2016 |
| --- | --- |
| 2003 | $25,788.63 |
| 2005 | $181,082.53 |
| 2006 | $71,752.07 |
| 2007 | $147,596.88 |
| 2008 | $23,252.12 |
| 2009 | $41,627.03 |
| 2010 | $1,064.35 |
| Total | $492,163.61 |

## II.   CONCLUSIONS OF LAW

73.   Each year, U.S. citizens who hold a financial account in a foreign country must report certain details about the account to the Treasury Department. See 31 U.S.C. § 5314; 31 C.F.R. § 103.24 (2009).

74.   The report must be made each year by filing an FBAR with the Treasury Department no later than June 30 of the following year. See 31 C.F.R. § § 103.27(c), (d), (e) (2009).

75.   Failure to file an FBAR can result in a fine up to $10,000.   31 U.S.C. § 5321(a)(5)(B).

76.   If a foreign account holder "willfully" failed to report the account on an FBAR, the maximum penalty is increased from $10,000 to the greater of $100,000 or fifty percent of the balance in the account at the time of violation.   31 U.S.C. §§ 5321(a)(5)(C), (D)(ii).

9

77. The only dispute in this matter is whether the Bohanecs' failure to timely file an FBAR disclosing their financial interest in their foreign accounts for 2007 was willful.

78. Section 5321 (a)(5) of Title 31 does not define willfulness.  31 U.S.C.  § 5321(a)(5).

79. The Supreme Court has explained that "willfully is a word of many meanings whose construction is often dependent on the context in which it appears." Safeco Ins. Co. of America v. Burr, 551 U.S. 47, 57 (2007) (internal quotations and citation omitted).

80. Although Defendants assert that "willfulness" encompasses only intentional violations of known legal duties, and not reckless disregard of statutory duties, no court has adopted that principle in a civil tax matter.   The only cases Defendants cite to support their argument that "willful" means that a defendant must have knowledge and specific intent are criminal cases. See Ratzlaf v. United States, 510 U.S. 135 (1994) (structuring); United States v. Eisenstein, 731 F.2d 1540 (11th Cir. 1984) (felonious failure to file currency transaction reports).

81. Where willfulness is an element of civil liability, the Supreme Court generally understands the term as covering "not only knowing violations of a standard, but reckless ones as well." Safeco, 551 U.S. at 57.

82. "Recklessness" is an objective standard that looks to whether conduct entails "an unjustifiably high risk of harm that is either known or so obvious that it should be known." Safeco, 551 U.S. at 68 (internal quotation marks and citation omitted).

83. Several other courts, citing Safeco, have held that "willfulness" under 31 U.S.C.  § 5321 includes reckless disregard of a statutory duty.   See United States v Williams, 489 Fed.Appx. 655, 658 (4th Cir. 2012); United States v. Bussell, No. CV 15-02034 SJO(VBKx), 2015 WL 9957826 at *5 (C.D. Cal. Dec. 8, 2015); see also United States v. McBride, 908 F.Supp. 2d 1186, 1204, 1209 (D. Utah 2012).

84. Defendants argue that the Chief Counsel of the Internal Revenue Service has opined, prior to Safeco, that the willfulness standard for purposes of 31 U.S.C.  §

10

1    5321 is the same as the criminal standard.  IRS CCA 200603026.  Chief Counsel

2    Advice, however, may not be used or cited as precedent.  26 U.S.C. § 6110(k)(3);

3    see also Elbaz v. Commissioner of Internal Revenue, T.C. Memo. 2015-49, 2015 WL

4    1197533 at *3 (T.C. 2015).

5    85.   The Internal Revenue Manual's interpretation of "willfulness" for purposes of 31

6          U.S.C. § 5321, cited by Defendants, does not have the force of law, and is not

7          relevant here.  See Fargo v. Commissioner of Internal Revenue, 447 F.3d 706, 713

8          (9th Cir. 2006); Kimdun Inc. v. United States, No. 16-cv-01500-CAS(RAOx), 2016

9          WL 4408816 at * 8 (C.D. Cal. Aug. 15 2016).

10   86.   The Supreme Court has held that a heightened, clear and convincing burden of

11         proof applies in civil matters "where particularly important individual interests or

12         rights are at stake."  Herman & MacLean v. Huddleston, 459 U.S. 375, 389 (1983).

13         Such interests include parental rights, involuntary commitment, and deportation.

14         Id.  The lower, more generally applicable preponderance of the evidence standard

15         applies, however, where "even severe civil sanctions that do not implicate such

16         interests" are contemplated.  Id. at 390; see also Grogan v. Garner, 498 U.S. 279,

17         286 (1991).   The monetary sanctions at issue here do not rise to the level of

18         "particularly important individual interests or rights."  Accordingly, the

19         preponderance of the evidence standard applies.  See also McBride, 908 F.Supp.2d

20         at 1214.

21   87.   The government has proved by a preponderance of the evidence that Defendants

22         were at least recklessly indifferent to a statutory duty for the following reasons:

23               a.   Defendants were reasonably sophisticated businesspeople.  For a

24                    time, Defendants' camera shop was the only exclusive Leica dealer

25                    in the world.  The deals Defendants negotiated with Leica's U.S.

26                    distributor were so favorable as to motivate other Leica retailers to

27                    protest.  Defendants were able to circumvent Leica's supply

28                    restrictions by entering into an international agreement with Leitz

Canada.  Defendants had a worldwide reputation and sold and shipped to customers around the world.   Defendants knew that they had to pay taxes if they earned money, and that they had to file tax returns.  Defendants always used a tax preparer to prepare the camera shop's tax returns.  Defendant August Bohanec was sufficiently sophisticated to obtain two patents without assistance. Defendants also managed the construction of a home along the coast of Mexico, including the hiring of a contractor and the opening of a Mexican bank account.

b. Defendants were at least reckless, if not willfully blind, in their conduct with respect to their Swiss UBS account and their reporting obligations regarding the account.[2]  Defendants never provided UBS with their home address, and never told anyone other than their children of the existence of the UBS account, including the tax preparers Defendants hired to help them file tax returns.  Defendants never asked a lawyer, accountant, or banker about requirements regarding the UBS account, and never used a bookkeeper or kept any books once the UBS account was opened.

c. Defendants' representations that they were unaware of or did not understand their obligations, and deferred entirely to Kluck, are not credible.  Part III of Schedule B of Defendants' 1998 tax return put them on notice that they needed to file an FBAR.  Defendants not only deposited commissions from their Leitz Canada deals into the UBS account, but also directed customers to deposit payment into the account and made several transfers and withdrawals from the

---

[2] See McBride, 908 F.Supp.2d at 1205 ("Where a taxpayer makes a conscious effort to avoid learning about reporting requirements, evidence of such willful blindness is a sufficient basis to establish willfulness.") (internal quotation marks and citation omitted).

UBS account to other foreign and domestic accounts.  Self-serving testimony that Defendants believed that there were no requirements regarding the account because they were intended to use the funds in the account "for retirement" is sufficiently incredible, particularly in light of Defendants' level of sophistication, to call into question the veracity of the remainder of their testimony.  (RT 14:7-23.)

d.  Defendants' credibility is further undermined by their conduct with respect to their application to participate in the IRS' Voluntary Disclosure Program for Offshore Accounts.  Defendants made several misrepresentations under penalty of perjury.  Defendants misrepresented, for example, that all of the funds in the UBS account were after-tax proceeds from Defendants' used camera business, when in fact the account included Leitz Canada commissions that had never been reported on income tax returns.  The application also failed to disclose Defendants' Austrian bank account.  Furthermore, Defendants then proceeded to file false tax returns for 2003-2008 that did not include any of Defendants' income from internet sales.  Defendants' FBARs for 2003-2008 did not disclose the Austrian account and the FBARs for 2006-2008 did not disclose the Mexican account.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**III.     CONCLUSION**

Defendants' failure to timely file an FBAR for 2007 was willful.  The maximum penalty is therefore increased to the greater of $100,000 or fifty percent of the balance in the foreign accounts on June 30, 2008.

**IT IS SO ORDERED.**

Dated: December 8, 2016

_____
DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE